U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2014 JUN 24  PM 4: 30

CLERK

BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

STEPHEN MARK GREEN,                    )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )     Case No. 5:13-cv-168
                                       )
SPRINGFIELD MEDICAL CARE SYSTEMS,      )
INC. and SPRINGFIELD HOSPITAL, INC.,   )
d/b/a SPINGFIELD HOSPITAL,             )
                                       )
          Defendants.                  )

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART
DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**
(Docs. 36, 38)

Plaintiff Stephen Mark Green brings this action against Defendants Springfield Medical Care Systems, Inc. and Springfield Hospital, Inc., d/b/a Springfield Hospital (collectively "Springfield Hospital"). In Count I of the Complaint, Plaintiff alleges Springfield Hospital unlawfully terminated his employment in retaliation for reporting concerns about improper patient care practices. Count III alleges a violation of Vermont's Consumer Protection Act ("CPA"), 9 V.S.A. § 2453b, and Count IV asserts a violation of the Sherman Act, 15 U.S.C. § 1, based on Plaintiff's allegations that Springfield Hospital conspired with other hospitals to depress the wages of nurse anesthetists in Vermont. Counts II, V, and VI allege claims of breach of contract, promissory estoppel, and intentional infliction of emotional distress, respectively. Presently before the court are the parties' cross-motions for partial summary judgment on Counts I, III, and IV. (Docs. 36, 38.) Oral argument was held on March 20, 2014.

Plaintiff is represented by Jeremiah R. Newhall, Esq. and Stephen D. Ellis, Esq. Springfield Hospital is represented by Andrew H. Maass, Esq.

I.      **Factual Background.**

   A.      **Undisputed Facts.**

Plaintiff is a Certified Registered Nurse Anesthetist ("CRNA") and was employed by Springfield Hospital in its Department of Surgery from on or about October 9, 2006 through June 23, 2012.  During the relevant time period, Plaintiff was the only CRNA on Springfield Hospital's anesthesiology staff as all other providers were anesthesiologists. Plaintiff's immediate supervisor was Dr. Sara Schaefer, the Director of Anesthesia.  Dr. Schaefer reported directly to Janet Sherer, who oversaw Anesthesiology and Peri-operative Services in her capacity as Chief of Patient Care Services.  Plaintiff's employment with Springfield Hospital was governed by a written employment agreement which permitted Springfield Hospital to terminate Plaintiff's employment without cause with ninety days' notice.

   1.      **Springfield Hospital's Stated Reasons for Plaintiff's Termination**.

On March 19, 2012, Springfield Hospital's then CEO, Glenn Cordner, told Plaintiff that his employment would be terminated as of June 21, 2012 without cause as part of Springfield Hospital's efforts to reduce the costs in the peri-operative area in response to declining surgical volumes.  In a March 22, 2012 email to Plaintiff, Dr. Schaefer "expressed sympathy" for Plaintiff's termination and advised that she had not been consulted in the matter.  (Doc. 36-1 ¶ 4.)  In this same email, she stated: "I'm sure Glenn [Cordner] told you that it was purely a financial decision.  Apparently they hired a consultant who told them that our anesthesia department was overstaffed and recommended the layoff as a cost-saving measure." *Id*.  Dr. Schaefer explained that she "informed them of all the problems that would ensue, including the (obvious) detrimental effects this will have on patient safety, diminished services, longer OR turnover, increased work load and burn-out issues." *Id*.

In its answers to Plaintiff's interrogatories, Springfield Hospital averred that Mr. Cordner made the decision to terminate Plaintiff on his own without consulting anyone

else.  Mr. Cordner made this same statement to Plaintiff.  Dr. Schaefer also testified that she was not consulted in the decision.

In contrast, Ms. Sherer testified that the decision to terminate Plaintiff's employment was the result of discussions between herself, Dr. Schaefer, and Mr. Cordner.  In her deposition, she described these conversations as follows:

> There were multiple discussions about multiple options prior to laying Mark off, and Mark's layoff [was] a small part, although I don't want to minimize it, a small part of what we were looking at overall in how we were going to save money in Peri[-]operative Services.
>
> So, there were things that we had done prior to laying Mark off; there were things that we continued to do after Mark was laid off to try to get ourselves into a better financial position.  So, in addition to examining— you know, is a physician laid off?  Is a CRNA laid off?  We also looked at outside companies to provide our service which would have meant everybody in the Anesthesia Department went.

(Doc. 36-17 at 39:22-40:12.)  Ms. Sherer further explained, "[a]s we were looking at decreasing the hours of anesthesia providers that we had in-house, we felt that it made sense that those actually be M.D.s since we would have fewer hours of providers in-house."  *Id.* at 31:7-31:11.  She stated that these discussions took place "as we were talking about laying Mark off, what was the model that we wanted going forward."  *Id.* at 39:14-39:16.  Ms. Sherer testified that the decision to terminate Plaintiff's employment was not recommended by a consultant, although Springfield Hospital did consider replacing all of the anesthesia staff with independent contractors.  She did not "think" anyone ever determined whether Springfield Hospital "would save more money by firing [Plaintiff]" instead of one of the "other anesthesia providers," *id.* at 98:13-98:18; however, reducing anesthesia hours and "laying [Plaintiff] off did result in cost savings."  *Id.* at 94:25-95:1.

### 2.    Plaintiff's Patient Care Complaints.

During his employment at Springfield Hospital, Plaintiff reported numerous concerns regarding patient care practices.  He expressed his concerns to Dr. Schaefer, Ms. Sherer, and Mr. Cordner, among others.  Plaintiff's reports included concerns

3

regarding the patient care practices of Dr. A.F., an anesthesiologist, and nurse E.W.,
Director of Peri-operative Services.  In response, Dr. Schaefer and Ms. Sherer
summarized Plaintiff's concerns in emails and other memoranda maintained by
Springfield Hospital as part of their business records.[1]

On April 23, 2009, Plaintiff reported to Dr. Schaefer that Dr. A.F. was neglecting
patients under his care and entering normal vital signs on patient records when monitors
showed abnormal levels.  That same day, Dr. Schaefer met with Dr. A.F. to discuss
Plaintiff's report.  Dr. A.F. admitted that he entered inaccurate data, but expressed
concern that Plaintiff was retaliating against him for a harassment complaint he had
previously filed against Plaintiff.  On April 26, 2009, Plaintiff sent Dr. Schaefer a follow-
up email stating that Dr. A.F.'s "professional misconduct" should be reported to the
Vermont Board of Medical Practice (the "Vermont Medical Board").  (Doc. 36-1
¶ 25(c)).  Dr. Schaefer advised Plaintiff that she would "personally keep a close eye on"
Dr. A.F. and requested that Plaintiff report all future concerns to her rather than the
Vermont Medical Board.  (Doc. 38-2 ¶ 7.)  She stated that filing a complaint with the
Vermont Medical Board "would prevent [Dr. A.F.] from leaving this practice if he were

---

[1] Plaintiff asserts that Springfield Hospital cannot rely on certain emails, memoranda, and letters
because they are inadmissible hearsay when offered by an opposing party.  Springfield Hospital
contends the documents are admissible under the business records exception.  *See* Fed. R. Evid.
803(6) (exempting from the hearsay rule contemporaneous business records made "by—or from
information transmitted by—someone with knowledge," and "kept in the course of a regularly
conducted activity of a business" by a business whose "regular practice" it was to make such
records).  The Second Circuit has "stated that Rule 803(6) favors the admission of evidence
rather than its exclusion if it has any probative value at all."  *United States v. Kaiser*, 609 F.3d
556, 574 (2d Cir. 2010) (internal quotation marks omitted).  Springfield Hospital submitted the
affidavit of Bob Demarco, Chief of Quality and Systems Improvement, averring that he is
personally familiar with the documents in question and that they "were created in the regular
course of business at Springfield Hospital."  (Doc. 44-5 ¶ 10.)  Although not fully compliant with
the foundation required by Rule 803(6), this affidavit provides a sufficient basis for the court to
consider the internal emails, memoranda, letters, and hospital records in ruling on summary
judgment as both parties rely on them.  *See Woods v. City of Chicago*, 234 F.3d 979, 988 (7th
Cir. 2000) ("[A]t the summary judgment stage, the party seeking to offer the business record
must attach an affidavit sworn to by a person who would be qualified to introduce the record as
evidence at trial, for example, a custodian or anyone qualified to speak from personal knowledge
that the documents were admissible business records.").

to so choose, until any investigation was resolved." (Doc. 38-9 at 4.)  She explained that, "while I take your concerns seriously, I think a formal complaint to the [Vermont Medical Board] would require substantial proof of ongoing and willful misconduct.  I haven't seen evidence of that."  *Id.*  Dr. A.F. and Dr. Schaefer attended medical school together and socialized outside the workplace.

On April 27, 2009, Ms. Sherer and Dr. Schaefer discussed Plaintiff's concerns regarding Dr. A.F.'s patient care and Dr. A.F.'s harassment charge against Plaintiff.  Dr. Schaefer advised that she spoke with Dr. A.F. regarding "each situation" raised by Plaintiff and "expressed concern that [Plaintiff] might report Dr. [A.F.]."  *Id.* at 9.  Ms. Sherer explained that Dr. Schaefer needed to evaluate and periodically monitor Dr. A.F. to ensure that he was "following standards of practice and policies."  *Id.*  Thereafter, on May 25, 2009, Ms. Sherer met with Plaintiff concerning Dr. A.F.'s harassment charge and advised him that she had no evidence to support Dr. A.F.'s allegations.  During the meeting, Plaintiff reiterated his clinical concerns about Dr. A.F., and Ms. Sherer encouraged him to voice all concerns about Dr. A.F. to either Dr. Schaefer or herself in the future.

In a July 13, 2009 memorandum, Dr. Schaefer detailed an incident in which she relieved Dr. A.F. for a break and discovered that he had entered false data on a patient's chart.  Dr. Schaefer confronted Dr. A.F. with the discrepancy, which he admitted, and she instructed him to keep accurate records in the future.

On September 7, 2010, Dr. Schaefer spoke again with Dr. A.F. regarding "recent and ongoing complaints" reported by other Springfield Hospital staff concerning his inattentiveness during procedures and inaccurate record-keeping in the operating room.  *Id.* at 7.  Dr. Schaefer also discussed these complaints with Dr. Decil Beehler, Chief Medical Staff Quality Officer, who instructed her to document all complaints about Dr. A.F. in the confidential Safety Risk Management ("SRM") system managed by Mr. DeMarco.  Dr. Schaefer wrote a summary of the conversation in which she concluded: "[I will] encourage anyone who notes deficits within AF's practice to record those observations in the SRM system for review by myself and Dr. Beehler.  In the meantime,

5

I will personally observe AF's practice and hope to see continued improvement." (Doc. 38-2 ¶ 12.)

On September 15, 2010, Dr. A.F. met privately with Dr. Schaefer and reported that Plaintiff was "harassing" him by reviewing patient "charts in search of inadequacies so that he can levy complaints against [Dr. A.F.]." (Doc. 36-12 at 11.) Dr. Schaefer determined that she would advise Plaintiff "that his enquiries are inappropriate and unnecessary, as the appropriate measures have been taken in regards to [Dr. A.F.], and that those measures are not public." *Id.*

In December 2011, Plaintiff reported to Ms. Sherer that nurse D.C. was being argumentative in the operating room, causing disruptions, and thereby undermining patient care. On February 15, 2012, Plaintiff reported that nurse D.C. left the operating room during a procedure. That same day, nurse E.W. spoke with nurse D.C., who answered affirmatively when asked whether "the workplace was hostile." *Id.* at 13. On February 29, 2012, Plaintiff followed up with Dr. Schaefer regarding a patient care concern involving nurse E.W. and inquired whether she had filed a complaint in the SRM. Dr. Schaefer responded that she had not because she preferred the SRM information to come from an eyewitness or someone involved with the case and the incident appeared to involve a "rare and uncharacteristic mistake" by nurse E.W. *Id.* at 14. She further stated that "[i]f you or anyone else experiences less than professional treatment from [nurse E.W.] (or anyone else, for that matter) please follow the established channels: file a report, talk to me, or speak to Jan Sherer if I'm away." *Id.*

### 3.    The "Action Plan" and Plaintiff's Performance Evaluations.

On March 8, 2011, Ms. Sherer instructed Dr. Schaefer to contact Plaintiff concerning an "action plan" designed to address ongoing complaints that other employees had filed against him over the course of several years. (Doc. 36-11 at 2-3.) Ms. Sherer explained that the purpose of the action plan was to provide Plaintiff with an "opportunity to change [his] behavior" and "demonstrate sustained improvement." *Id.* Ms. Sherer instructed Dr. Schaefer to "[k]eep the focus on him" and not "let him go down the path of talking about other people's behavior." *Id.* at 3.

In a March 10, 2011 email, Dr. Schaefer reported back to Ms. Sherer and explained that, when presented with the action plan, Plaintiff "wanted to know why this was happening now." *Id.* at 2. Dr. Schaefer also described "one specific thing that concerned [her]," which was Plaintiff's remark that, "if this is how it's going to be," then he was going to file his complaints about Dr. A.F. with the Vermont Medical Board. *Id.* Dr. Schaefer noted that Plaintiff "has made many complaints about Dr. [A.F.] that have not proven to be valid, and I have not found Dr. [A.F.'s] record keeping to be lacking at all." *Id.* She also commented that she thought Plaintiff's "threat" was "certainly inappropriate." *Id.*

In a memorandum dated May 31, 2011, Dr. Schaefer evaluated Plaintiff's response to the action plan and concluded that she was "satisfied with the effort and progress that [Plaintiff] ha[d] demonstrated," pointing out that he had "improved communication with colleagues" and "demonstrated that he has perspective on the issues of comportment." (Doc. 36-1 ¶ 28.) In a "Recredentialling Assessment" dated July 6, 2011, Dr. Schaefer noted Plaintiff's "excellent clinical skills and judgment" and reported that he was "responsive to constructive criticism." *Id.* ¶ 29. In his "Section Chair Evaluation" dated June 24, 2011, Plaintiff received the highest rating in all categories except for his ability to communicate with others, for which he received the second highest score. *Id.*

### 4.    Opting-Out of Medicare's Supervision Requirement.

While Plaintiff was employed with Springfield Hospital, he was also the president of the Vermont Association of Nurse Anesthetists. In that role, Plaintiff urged various hospitals to opt-out of a federal Medicare regulation requiring CRNAs to work under the supervision of the operating surgeon or an anesthesiologist who is immediately available if needed.[2]  States may elect to opt-out of this Medicare requirement,[3] but Vermont's

---

[2] *See* 42 C.F.R. § 482.52(a)(4) (providing that a CRNA can only administer anesthesia if he or she "is under the supervision of the operating practitioner or of an anesthesiologist who is immediately available if needed").

[3] *See* 42 C.F.R. § 482.52(c)(1) (instructing that a hospital "may be exempted from the requirement for physician supervision of CRNAs . . . if the State in which the hospital is located

Governor Peter Shumlin has not done so.  Plaintiff discussed this matter with Mr. Cordner and "encourage[ed]" him to ask Governor Shumlin to opt-out.  (Doc. 38-3 at 11:6-11:10.)

On February 2, 2012, Mr. Cordner wrote Governor Shumlin and urged him to opt-out of the supervision requirement, noting that "Springfield Hospital has always utilized the services of CRNAs in an independent care model, along with anesthesiologists.  It is our experience that CRNAs are highly trained and skilled and our patients receive the highest of quality anesthesia care." (Doc. 36-15 at 2.)  Mr. Cordner explained: "Because the rules are ambiguous, they can lead surgeons to believe that they are liable for the CRNA's practice[,] and this incorrect belief may affect our efforts to recruit new physicians and surgeons to this hospital." *Id.*

### 5.   The Termination Discussion and its Aftermath.

On March 19, 2012, when Mr. Cordner advised Plaintiff that his employment was being terminated without cause as the result of cost-saving measures, Plaintiff questioned this explanation.  Mr. Cordner discussed with Plaintiff the fact that Governor Shumlin had not yet decided whether to opt-out of the supervision requirement for CRNAs. Thereafter, Mr. Cordner sent Plaintiff a letter dated March 21, 2012 explaining that "the elimination of your position in the Anesthesia Department is part of our effort to reduce costs in the peri-operative area in the face of declining surgical volume." (Doc. 38-2 ¶ 21.)  He also provided Plaintiff with an unsolicited letter of recommendation dated March 28, 2012, which stated in pertinent part:

> Unfortunately, this hospital has experienced a downward trend in surgical volume which resulted in our being overstaffed in anesthesia.  Mark's position was eliminated as part of an effort to better align our staffing with our workload.

*Id.* ¶ 22.

Surgical volume began to decrease approximately three to four years before Plaintiff was terminated, at which point Springfield Hospital began asking nursing staff

---

submits a letter to CMS signed by the Governor . . . requesting exemption from physician supervision of CRNAs").

to stay home on certain days.  Plaintiff himself observed this downward trend in surgical volume, which was discussed at medical staff meetings beginning a year prior to his termination.  After Plaintiff's termination, Springfield Hospital began closing the operating room on certain days and sought to decrease expenses for some of the items that they purchased.

During Plaintiff's employment, his salary was approximately $200,000 per year, while the salaries of the five anesthesiologists were approximately $275,000, $275,000, $260,000, $218,000, and $327,000.  Springfield Hospital never analyzed whether terminating Plaintiff would produce greater cost-savings than terminating one of the anesthesiologists.  Since Plaintiff's termination, Springfield Hospital has not hired a CRNA and thus all of the remaining anesthesia providers are anesthesiologists.  At least one other hospital in Vermont provides anesthesiology services through an "all-M.D. model," (Doc. 38-2 ¶ 42), whereby services are provided only by anesthesiologists rather than CRNAs.

### B.    Disputed Facts.

The parties dispute the reason Springfield Hospital terminated Plaintiff's employment.  Springfield Hospital asserts that it eliminated Plaintiff's position as a cost-saving measure and further explains that it terminated Plaintiff rather than one of the anesthesiologists as part of a transition to an all-M.D. model.  Plaintiff contends the real reason for his termination was retaliation for his whistleblowing activities regarding patient care issues.  Plaintiff notes that there is no contemporaneous evidence that Springfield Hospital was moving towards an all-M.D. model at the time of his termination, that there was no cost savings analysis before or after his termination, and that Chief Financial Officer Andrew Majka opined that Springfield Hospital "could have saved even more money if [it] would have kept the CRNA and had the same reduction in [hours]."  (Doc. 36-18 at 49:15-49:20.)  He contends that in his termination discussion with Mr. Cordner, Mr. Cordner admitted that there was not much of a difference in cost-savings resulting from the termination of Plaintiff as compared to the termination of other anesthesia providers and did not mention an all-M.D. model.

The parties also dispute whether Mr. Cordner admitted that he was terminating Plaintiff for whistleblowing.  Plaintiff represents that during his March 19, 2012 meeting with Mr. Cordner, he challenged the cost-saving rationale on the basis that the other anesthesia providers received higher salaries.  Plaintiff stated that he was being terminated as a result of his repeated complaints concerning other providers, to which Mr. Cordner "nodded and muttered 'yeah,' but declined to elaborate."  (Doc. 36-1 ¶ 2(b).)  Plaintiff pressed Mr. Cordner for the "real reason" behind his termination, but Mr. Cordner did not discuss the issue further.  *Id.* ¶ 2(c).  Plaintiff contends that this evidence supports his claim that Mr. Cordner admitted Plaintiff's whistleblowing activities gave rise to his termination.  Springfield Hospital responds that Plaintiff's version of this conversation is based upon Plaintiff's own interpretation of Mr. Cordner's ambiguous gesture and comment; however, it does not offer any countervailing evidence disputing Plaintiff's account.  Springfield Hospital nonetheless points out that Plaintiff testified that Mr. Cordner never gave him any other reason for his termination other than as a cost-saving measure.  In addition, Springfield Hospital cites Plaintiff's testimony that Springfield Hospital and its agents never told him that his complaints were unfounded, never told him to stop voicing his concerns, and never suggested that his continued reports would jeopardize his employment.

Plaintiff counters that, after his deposition, Springfield Hospital produced records that supported an inference that his "action plan" was intended to discourage his whistleblowing activities and that Dr. Schaefer falsely stated that she found many of Plaintiff's concerns regarding Dr. A.F. to be invalid, that she had not found Dr. A.F.'s record keeping deficient in any respect, and that she would advise Plaintiff that his inquiries regarding Dr. A.F. were inappropriate and unnecessary.  He contends Dr. Schaefer's allegedly false statements are relevant as she was a decision-maker in his termination.  Springfield Hospital, in turn, points to evidence that other health care providers had complained about Plaintiff and that, in its action plan, Springfield Hospital appropriately counselled Plaintiff regarding how he could improve his relationships with other staff members and his comportment.

10

The parties dispute whether Mr. Cordner threatened to retaliate against Plaintiff after he received notice of his termination. Plaintiff contends that Mr. Cordner agreed to pay the fees for Plaintiff's licenses and half the premium for Plaintiff's malpractice insurance after notifying Plaintiff that his employment was being terminated, but before the termination's effective date. Thereafter, Mr. Cordner threatened not to make these payments upon learning that Plaintiff intended to speak to Governor Shumlin about the patient care issues he had reported throughout his employment. After Plaintiff told Mr. Cordner that his priority was to try to find employment rather than to speak with Governor Shumlin, Mr. Cordner made the agreed upon payments. Springfield Hospital responds that this allegation is mere speculation unsupported by evidence aside from Plaintiff's personal beliefs. It does not, however, offer any contrary evidence from Mr. Cordner. Springfield Hospital further contends the alleged conversation is not material because it occurred after Mr. Cordner notified Plaintiff that his employment was being eliminated, "and Plaintiff admitted that Mr. Cordner did not know about Plaintiff's plan to contact the Governor until after Plaintiff was laid off." (Doc. 37-1 ¶ 11.) Plaintiff asserts the conversation is evidence of Mr. Cordner's retaliatory motive.

Finally, the parties dispute whether Springfield Hospital is bound by its Rule 30(b)(6) deposition. On October 10, 2013, Plaintiff served Springfield Hospital with a Notice of Rule 30(b)(6) Corporate Deposition of Springfield Hospital (the "Notice of Deposition"), which identified nineteen issues about which Plaintiff intended to inquire. On November 19, 2013, Springfield Hospital produced Mr. Majka to testify on its behalf in response to the Notice of Deposition. During his deposition, Mr. Majka could not provide any information concerning the termination of Plaintiff's employment with Springfield Hospital.[4] Mr. Majka testified that he assumed that Mr. Cordner made the

---

[4] During Mr. Majka's deposition, Plaintiff's counsel stated that he had a "huge problem" with the fact that Mr. Majka was "clearly not prepared or capable of testifying as to almost all of the matters designated in [the Notice of Deposition]." (Doc. 36-18 at 55:25, 56:20-57:1.) In response, counsel for Springfield Hospital referenced a prior conversation in which he advised that "many of the subject matters would be dealt with [by] Janet Lyle and Janet Sherer," whom Plaintiff deposed the day before Mr. Majka, because they had "knowledge" of the issues listed

decision to eliminate Plaintiff's position, and that Ms. Sherer would have knowledge concerning who may have contributed or consulted with Mr. Cordner in reaching that decision. Mr. Majka further explained that he neither reviewed the matters identified in the Notice of Deposition, nor spoke with Mr. Cordner or Ms. Sherer in preparation for his deposition. He was aware that "a decision [was] made to go to an all-physician, all-anesthesiologist model," but he could not recall exactly when he learned of the transition and assumed Ms. Sherer informed him of the change. (Doc. 36-18 at 36:9-36:24.) He acknowledged that the decision to go to an all-M.D. model may have been made as late as 2013.[5]

Plaintiff asks the court to find that Springfield Hospital is "bound by the deposition testimony of [its] Rule 30(b)(6) designee," Mr. Majka, "who was unable to explain CEO Cordner's selection of Plaintiff for 'layoff.'" (Doc. 36 at 15.) "Under Rule 30(b)(6), when a party seeking to depose a corporation announces the subject matter of the proposed deposition," the "corporate deponent has an affirmative duty to make available such number of persons as will be able to give complete, knowledgeable and binding answers on its behalf." *Reilly v. Natwest Mkts. Group Inc.*, 181 F.3d 253, 268 (2d Cir. 1999) (internal quotation marks omitted); *see also Sea Trade Co. Ltd. v. FleetBoston Fin. Corp.*, 2008 WL 4129620, at *21 (S.D.N.Y. Sept. 4, 2008) ("Testimony of a Rule 30(b)(6) witness is . . . binding on the party that designated the witness.")

---

in the Notice of Deposition. *Id.* at 57:2-58:3. Counsel explained that these individuals had "absolutely" testified on behalf of Springfield Hospital concerning "[s]ome of the issues," and represented that, if "there is other information that was left unanswered after [Ms. Lyle, Ms. Sherer, and Mr. Majka] were deposed," he "would be happy to make anybody else available" except for Mr. Cordner, who was "unavailable for reasons beyond anybody's control." *Id.* at 57:25-58:11. Plaintiff's counsel acknowledged that Mr. Cordner would be unavailable, but stressed that he had "issue with" Mr. Majka's lack of "prepar[ation]" and subsequently "suspend[ed]" his deposition. *Id.* at 57:6-57:17.

[5] Plaintiff points out that shortly before his termination, in a letter to the Governor urging him to opt-out of certain regulations, Mr. Cordner enthusiastically endorsed the use of CRNAs as opposed to relying solely on anesthesiologists. Plaintiff contends that this undercuts the credibility of Springfield Hospital's claim that Plaintiff's termination was part of a transition to an all-M.D. model.

(internal quotation marks omitted). However, the Rule does not "absolutely bind[] a corporate party to its designee's recollection." *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001). Instead, the deposition binds the 30(b)(6) deponent as a representative of the party:

> It is true that a corporation is bound by its Rule 30(b)(6) testimony, in the same sense that any individual deposed under Rule 30(b)(1) would be bound by his or her testimony. All this means is that the witness has committed to a position at a particular point in time. It does not mean that the witness has made a judicial admission that formally and finally decides an issue. Evidence may be explained or contradicted. Judicial admissions, on the other hand, may not be contradicted.

*Sea Trade Co. Ltd.*, 2008 WL 4129620, at *21 (internal quotation marks and alterations omitted); *see also Erickson v. Microaire Surgical Instruments LLC*, 2010 WL 1881942, at *2 (W.D. Wash. May 6, 2010) ("The testimony of a Rule 30(b)(6) representative, although admissible against the party that designates the representative, is not a judicial admission absolutely binding on that party.").

Plaintiff relies on a separate line of cases holding that, "[u]nless it can prove that the information was not known or was inaccessible, a corporation cannot later proffer new or different allegations that could have been made at the time of the 30(b)(6) deposition." *Rainey v. Am. Forest & Paper Ass'n, Inc.*, 26 F. Supp. 2d 82, 94 (D.D.C. 1998). *Rainey* has been criticized by several courts, which find that "[n]othing in the advisory committee notes indicates that the Rule goes so far." *A.I. Credit Corp.*, 265 F.3d at 637; *see also Cont'l Cas. Co. v. First Fin. Employee Leasing, Inc.*, 716 F. Supp. 2d 1176, 1190 (M.D. Fla. 2010) (concluding that *Rainey* and its progeny "overstate the binding effect of Rule 30(b)(6) testimony"). The court therefore follows the "sounder view" that "testimony given at a Rule 30(b)(6) deposition is evidence which, like any other deposition testimony, can be contradicted and used for impeachment purposes." *A.I. Credit Corp.*, 265 F.3d at 637 (internal quotation marks omitted). As a result, Rule 30(b)(6) does not preclude consideration of evidence from other witnesses regarding the reason for terminating Plaintiff's employment.

II.     **Conclusions of Law and Analysis.**

A.      **Standard of Review.**

Summary judgment must be granted when the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986) (internal quotation marks omitted).

In deciding the motion, the trial court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party, and deny the motion if a rational juror could decide in favor of that party under the applicable law. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "There is no material fact issue only when reasonable minds cannot differ as to the import of the evidence before the court." *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"When both sides have moved for summary judgment, each party's motion is examined on its own merits, and all reasonable inferences are drawn against the party whose motion is under consideration." *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011).

In this case, Plaintiff seeks summary judgment with regard to his whistleblower claim in Count I, contending that Springfield Hospital has not and cannot articulate a legitimate business reason for his termination. Springfield Hospital opposes the motion, initially arguing that Plaintiff has failed to establish a prima facie case of retaliation and that, even if Plaintiff can satisfy this requirement, Springfield Hospital has articulated a legitimate business reason for Plaintiff's termination which shifts the burden to Plaintiff

14

to establish that reason is pretextual. At oral argument, Springfield Hospital conceded for purposes of summary judgment that Plaintiff could establish a prima facie case so the only issue is whether Springfield Hospital has articulated a legitimate, non-discriminatory reason for Plaintiff's termination.

In its cross-motion for summary judgment, Springfield Hospital asserts that no rational juror could find Plaintiff's evidence of pretext sufficient. In addition, Springfield Hospital moves for summary judgment on Plaintiff's consumer protection and antitrust claims, contending that Plaintiff has adduced no admissible evidence in support of those claims. Plaintiff opposes summary judgment on his retaliation claim, asserting that he has proffered admissible evidence of pretext and the weight of this evidence and the credibility of the witnesses must be decided by the trier of fact. Without proffering evidence in support of his consumer protection and antitrust claims, Plaintiff argues that summary judgment on those claims is premature.

**B.      Count I—Plaintiff's Whistleblower Claim.**

Plaintiff argues that Springfield Hospital terminated his employment in retaliation for his complaints about improper patient care practices, in violation of Vermont's Healthcare Whistleblower Protection Act, 21 V.S.A. §§ 507-509 which provides in relevant part:

> (b) No employer shall take retaliatory action against any employee because the employee does any of the following:
>
> (1) Discloses or threatens to disclose to any person or entity any activity, policy, practice, procedure, action, or failure to act of the employer or agent of the employer that the employee reasonably believes is a violation of any law or that the employee reasonably believes constitutes improper quality of patient care.
>
> . . .
>
> (3) Objects to or refuses to participate in any activity, policy, or practice of the employer or agent that the employee reasonably believes is in violation of a law or constitutes improper quality of patient care.

21 V.S.A. § 507(b).

Under Vermont law, the essential elements of a retaliation claim are:

> (1) the plaintiff engaged in a protected activity; (2) the employer was aware of the activity; (3) the plaintiff suffered adverse employment consequences as a result of the activity; and (4) there was a causal connection between the activity and the consequences.

*Griffis v. Cedar Hill Health Care Corp.*, 2008 VT 125, ¶ 12,185 Vt. 74, 967 A.2d 1141.

Without specifically adopting the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) for whistleblower retaliation cases, in *Griffis*, the Vermont Supreme Court observed that it uses the *McDonnell Douglas* standard for Vermont Fair Employment Practices Act ("FEPA") claims, and it analyzed the propriety of a judgment following a bench trial for a whistleblower retaliation claim by making reference to the *McDonnell Douglas* standard. *See Griffis*, 2008 VT 125, ¶¶ 12-13 & n.3. Both parties have assumed that the *McDonnell Douglas* burden-shifting framework applies although, as Plaintiff accurately notes, the *McDonnell Douglas* test is inapplicable when a plaintiff produces direct evidence of retaliation. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("The *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination. The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the plaintiff has his day in court despite the unavailability of direct evidence.") (internal citation, quotation marks, and brackets omitted). Without deciding the issue, the court will analyze the parties' cross-motions for summary judgment in accordance with the *McDonnell Douglas* standard because both parties have presented their arguments in the context of that framework. [6]

---

[6] The Vermont Supreme Court has also not yet decided whether to adopt the Supreme Court's conclusion in *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013), that in Title VII retaliation cases, "but-for causation" (as opposed to a substantial or motivating factor) must be established and thus a plaintiff must prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 2533. The *Nassar* Court held that Congress's use of the word "because" in Title VII's antiretaliation provision, 29 U.S.C. § 2000e-3(a), imported a but-for causation standard. *Nassar*, 133 S. Ct. at 2528. The antiretaliation provision of the Vermont's Healthcare Whistleblower Protection Act also uses the word "because." *See* 21 V.S.A. § 507(b) ("No employer shall take retaliatory action against any employee because the employee does any of the following[.]"). However,

### 1.   Whether Springfield Hospital Has Articulated a Legitimate Reason for Terminating Plaintiff's Employment.

Plaintiff's sole argument in support of his motion for summary judgment on Count I is that Springfield Hospital failed to articulate a legitimate, nondiscriminatory reason for terminating his position.  In step two of the *McDonnell Douglas* framework, an employer must articulate a legitimate, non-discriminatory reason for the adverse employment action.  *See Lamay v. State*, 2012 VT 49, ¶ 8, 191 Vt. 635, 49 A.3d 559.  Springfield Hospital satisfies this burden by citing evidence that surgical volume was declining, that various cost-saving measures were implemented which did not involve Plaintiff, and that Plaintiff's position was eliminated as "part of [Springfield Hospital's] effort to reduce costs in the peri-operative area in the face of declining surgical volume."  (Doc. 38-2 ¶ 21).  *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1226 (2d Cir. 1994) (ruling that affidavits in age discrimination case that showed "[employer] was in a business downturn and that a reduction-in-force was necessary to meet its budgetary goals" was "enough to rebut the presumption of age discrimination that [plaintiff's] *prima facie* case established"); *Sabatino v. Flik Int'l Corp.*, 286 F. Supp. 2d 327, 334 (S.D.N.Y. 2003) (agreeing with the "many courts [that] have found that a reduction in workforce for financial reasons is sufficient to fulfill a defendants' burden of production" under the *McDonnell Douglas* framework).  This conclusion is unaltered by Plaintiff's further contention that his termination did not ultimately result in cost-savings when compared to other available options.  *See Holcomb v. Iona Coll.*, 521 F.3d 130, 141 (2d Cir. 2008) ("It is not our task, at the second stage of the *McDonnell Douglas* framework, to assess the credibility of [the defendant's] witnesses; nor is it our role to determine whether the [defendant's] explanation of its action is convincing.  Instead, we ask

---

unlike FEPA, Vermont's Healthcare Whistleblower Protection Act is not patterned after Title VII.  Because the Vermont Supreme Court has held that "[t]he standards and burdens of proof to be applied under FEPA are identical to those applied under Title VII of the United States Civil Rights Act," *Robertson v. Mylan Labs., Inc.*, 2004 VT 15, ¶ 47, 176 Vt. 356, 848 A.2d 310, the court predicts that the Vermont Supreme Court will follow *Nassar* in a FEPA case.  It is an open question as to whether it will do so in analyzing claims under Vermont's Healthcare Whistleblower Protection Act.

whether defendant has introduced evidence that, '*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason.'") (citations omitted); *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1112 (2d Cir. 1988) (ruling that an employer must produce "a legitimate, nondiscriminatory reason for its actions toward the plaintiff, though at this stage the employer 'need not persuade the court that it was actually motivated by the proffered reasons'") (citation omitted).

Because Springfield Hospital has articulated a legitimate, nondiscriminatory reason for Plaintiff's termination, Plaintiff's motion for summary judgment on Count I is DENIED.

### 2.    Whether Plaintiff Can Establish Pretext.

Springfield Hospital cross-moves for summary judgment on Count I on the ground that Plaintiff cannot, as a matter of law, establish that its stated reasons for Plaintiff's termination were pretextual. *See Robertson*, 2004 VT 15, ¶ 34 (holding that, to survive summary judgment, the plaintiff must "demonstrat[e] that there is an issue of material fact underlying the question of whether the employer's reason for its action was pretextual"). It points out that it is undisputed that surgical volumes were declining and that the elimination of Plaintiff's position reduced costs for anesthesia services and permitted Springfield Hospital to transition to an all-M.D. model.

Plaintiff counters that summary judgment is not appropriate because there are disputed issues of material fact regarding the real reason for his termination. He points to the close temporal proximity between his protected activity on February 29, 2012 and his termination less than a month thereafter. He notes that his excellent 2011 performance evaluations must be considered in conjunction with Dr. Schaefer's alleged efforts to shield Dr. A.F. from Plaintiff's threats to report his concerns to the Vermont Medical Board, her statements that she found many of Plaintiff's concerns regarding Dr. A.F. to be invalid, unnecessary, and inappropriate, and her false statement that she had witnessed no improprieties with regard to Dr. A.F.'s record keeping.

Plaintiff points to evidence that Springfield Hospital never analyzed the cost-savings to be realized by Plaintiff's termination and admitted that greater savings could

have been achieved by terminating an anesthesiologist.  He also points to the conflicting testimony of Springfield Hospital's agents regarding who made the decision to terminate Plaintiff's employment and why.  These conflicting statements include Dr. Schaefer's false statement that Plaintiff's termination had been recommended by a consultant, and conflicting statements regarding who was consulted in the decision-making.

As evidence of a retaliatory motive, Plaintiff cites Dr. Schaefer's comment that Plaintiff's concerns with regard to Dr. A.F. were inappropriate and unnecessary, Mr. Cordner's nodding and saying "yeah" when Plaintiff suggested the real reason for his termination was his complaints about other providers, and Mr. Cordner's threat to withhold certain benefits if Plaintiff reported his patient care concerns to the Governor.

Finally, Plaintiff cites Springfield Hospital's assertion that Plaintiff's termination was part of a transition to an all-M.D. model when this was neither a stated reason for his termination, nor is there any evidence that a decision to opt for that model was made prior to or contemporaneous with his termination.  Plaintiff contends that when this evidence is examined in the light most favorable to him as the non-moving party, he has adduced sufficient evidence to render pretext a question for the jury.  Although a close question, the court agrees.

Generally, a "[c]ourt may not second-guess an employer's non-discriminatory business decisions, regardless of their wisdom." *Id.* ¶ 35 (internal quotation marks omitted); *see also Dister*, 859 F.2d at 1116 ("Evidence that an employer made a poor business judgment in discharging an employee generally is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons.").  "But where, as here, the plaintiff claims not that [his] employer used poor business judgment in discharging [him] but that [his] employer used the structural reorganization as a cover for discriminatory action," a court "is not forbidden to look behind the employer's claim that it merely exercised a business decision in good faith" so as "to ensure that the business decision was not discriminatory." *Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989); *see also Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) ("Even within the context of a legitimate reduction-in-

force, however, an employer may not discharge an employee 'because' of his age."); *see also Zann Kwan v. Andalex Grp. LLC,* 737 F.3d 834, 847 (2d Cir. 2013) (holding that "a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at [the pretext] stage").

Post-*Nassar*, the Second Circuit has held that a plaintiff may satisfy his burden on summary judgment "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Zann Kwan,* 737 F.3d at 846; *see also Dister,* 859 F.2d at 1113 ("We . . . join our sister circuits in finding that a plaintiff may prevail at trial if, in addition to establishing a prima facie case, he persuades a reasonable jury that the reason advanced for his discharge—job elimination due to business priorities and organizational changes—was unworthy of credence.").

Contrary to Springfield Hospital's contention, Plaintiff's evidence does not reflect "'minor discrepancies that do not cast doubt'" on the validity of its rationale for terminating Plaintiff, nor are they "'wholly irrelevant to it.'" (Doc. 44 at 7) (quoting *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006)). While "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage," *Zann Kwan*, 737 F.3d at 847, the timing of an adverse employment decision can support an inference of "improper motive" where the plaintiff proffers "some evidence other than chronology." *Adams v. Green Mountain R. Co.*, 2004 VT 75, ¶ 9, 177 Vt. 521, 862 A.2d 233. Here, a rational jury could find that Dr. Schaefer tried to prevent Plaintiff from filing complaints with the Vermont Medical Board and sought to channel Plaintiff's whistleblowing activities to herself and Ms. Sherer while falsely disputing the validity of Plaintiff's reports with regard to at least Dr. A.F. Dr. Schaefer expressed concern that Plaintiff may disregard her instructions and lodge complaints regarding patient care with the Vermont Medical Board. Based on this evidence, a jury could find that Dr. Schaefer, as Springfield Hospital's agent, actively discouraged Plaintiff from reporting patient care

concerns to outside authorities even when Plaintiff raised valid patient care concerns, and that she was motivated to take steps to ensure that Plaintiff's patient care concerns did not leave the hospital.

A rational jury could further find that Mr. Cordner did not make the decision to terminate Plaintiff without consulting both Dr. Schaefer and Ms. Sherer and that at least Dr. Schaefer had a retaliatory motive which, under a cat's paw theory, may be attributable to the decision-maker. *See Staub v. Proctor Hospital*, 131 S. Ct. 1186, 1193 (2011) (recognizing a cat's paw theory of retaliation in which the "employer is at fault [when] one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision").[7]

Although a rational jury is likely to conclude that Springfield Hospital needed to cut costs due to declining surgical volumes, in the light most favorable to the Plaintiff, the evidence shows that Springfield Hospital engaged in no analysis regarding whether Plaintiff's termination would actually save costs other than the costs saved by terminating any employee's employment. Springfield Hospital's Rule 30(b)(6) representative Mr. Majka opined that Springfield Hospital could have saved even more money if it retained Plaintiff as a CRNA and had the same reduction in hours. The jury could also find credible Plaintiff's testimony that Mr. Cordner acknowledged that Plaintiff's complaints regarding other providers prompted his termination. Based upon these findings, a jury could find that a legitimate need for cost-cutting provided the pretext for selecting Plaintiff for termination to ensure his whistleblowing activities would cease. *See Leibowitz v. Cornell University*, 584 F.3d 487, 504 (2d Cir. 2009) (holding summary judgment inappropriate where there were genuine issues of material fact and "[p]laintiff presented evidence before the district court from which it could be inferred that the

---

[7] The Vermont Supreme Court has neither adopted nor rejected the cat's paw theory of liability for claims brought under state law. *See Brown v. State*, 2013 VT 112, ¶ 17, 88 A.3d 402 (acknowledging "'cat's paw' theory of discrimination in violation of the [Uniformed Services Employment and Reemployment Rights Act]"); *Lamay v. State*, 2012 VT 49, ¶10 n.2, 49 A.3d 559 (citing *Staub* in an employment discrimination case and "assum[ing] without deciding that any discriminatory animus by . . . plaintiff's supervisor . . . could be attributable to the ultimate decision maker").

budgetary concerns cited by defendants were a pretext for discrimination"), *superseded on other grounds by statute*, Local Civil Rights Restoration Act of 2005, N.Y.C. Local L. No. 85, *as recognized in Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102 (2d Cir. 2013); *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 441 (7th Cir. 2010) (explaining "the issue for the jury is what actually motivated the defendant to terminate [plaintiff's] employment" and "the jury was entitled to disbelieve defendant's witnesses and conclude that its motivation was in fact retaliatory") (internal quotation marks and brackets omitted).

"[U]nless the defendants' proffered nondiscriminatory reason is 'dispositive and forecloses any issue of material fact,' summary judgment is inappropriate." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004) (citation omitted); *see also LaFond v. General Physics Services Corp.*, 50 F.3d 165, 174-75 (2d Cir. 1995) ("Thus, unless the employer has come forward with evidence of a dispositive non-retaliatory reason as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between plaintiff's evidence establishing a prima facie case and the employer's evidence of a non-retaliatory reason reflects a question of fact to be resolved by the factfinder after trial") (internal quotation marks and brackets omitted). In this case, Springfield Hospital's cost-saving measures and transition to an all-M.D. model are not "dispositive" reasons for Plaintiff's termination such that no rational trier of fact could reject them and conclude they were pretextual.

Because there are disputed issues of material fact, and because Plaintiff has proffered sufficient admissible evidence to survive summary judgment, Springfield Hospital's motion for summary judgment on Count I is DENIED.

### C.    Counts III and IV—Antitrust and Consumer Protection Claims.

Counts III and IV stem from Plaintiff's allegation that Springfield Hospital conspired with other hospitals to depress the wages of CRNAs in Vermont and retaliated against him for opposing this illegal restraint on trade, in violation of the CPA and the

22

Sherman Act, respectively.[8]  In support of these claims, Plaintiff alleges that Mr. Cordner told Plaintiff that he had discussed CRNA compensation with CEOs from other Vermont hospitals, whereupon they "laughed when they learned how much [Springfield Hospital] was paying [Plaintiff]." (Doc. 1 ¶ 123.)  Plaintiff contends that Mr. Cordner refused to give him a raise as a result of those discussions.

Springfield Hospital argues summary judgment should be granted with respect to both Plaintiff's antitrust and consumer protection claims because Plaintiff has adduced no evidence to support his conclusory allegations that Springfield Hospital conspired to unlawfully suppress CRNA wages in Vermont.  Plaintiff opposes summary judgment on the ground that his lack of evidence is a result of Springfield Hospital "stonewalling" his efforts to obtain information concerning these claims.  (Doc. 42 at 8.)  Consequently, he argues that his allegations supporting these claims should be deemed established, or these claims should be "severed and stayed pending disposition of [his] other claims."  *Id.*

A court may defer considering a motion for summary judgment or order additional discovery under Federal Rule of Civil Procedure 56(d) if "a nonmovant shows . . . it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d).  By affidavit or declaration, the nonmovant must describe: "(1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful."  *Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004) (interpreting prior version of rule).  Plaintiff, however, does not invoke Rule 56(d). For this reason, the court will not defer considering the merits of Springfield Hospital's motion for summary judgment on Counts III and IV.

---

[8] The CPA prohibits "retaliate[ion] against" a person for opposing any "act or practice which is collusive or in restraint of trade."  9 V.S.A. § 2453b.  In determining whether an act constitutes collusion, courts are to be "guided by the construction of federal antitrust law and the Sherman Act, as amended, as interpreted by the courts of the United States."  9 V.S.A. § 2453a(c). Accordingly, dismissal of Plaintiff's claims under the CPA and the Sherman Act turn on the threshold issue of whether Plaintiff has proffered admissible evidence of the alleged collusion or conspiracy to depress the wages of CRNAs.

"Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (internal citations, quotation marks, and alterations omitted). Plaintiff acknowledges that he has failed to produce any evidence establishing the existence of an agreement to suppress CRNA wages. *See Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999) ("Mere exchanges of information, even regarding price, are not necessarily illegal, in the absence of additional evidence that an agreement to engage in unlawful conduct resulted from, or was a part of, the information exchange."); *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 294 n.30 (5th Cir. 1988) (noting that the "mere exchange of information, or even consciously parallel action, is insufficient to establish a conspiracy under [§] 1"); *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 257-58 (2d Cir. 1987) (holding that "evidence of the mere exchange of information by competitors cannot establish a conspiracy"). Moreover, he identifies neither the participants to the alleged conspiracy, nor how and why it carried out its alleged restraints of trade. *See Bergman v. Spruce Peak Realty, LLC*, 847 F. Supp. 2d 653, 672 (D. Vt. 2012) (explaining that a CPA claim must allege facts "with sufficient particularity to notify [d]efendants of the who, what, when, where, and how of the claim") (internal quotation marks omitted); *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 333 (D. Vt. 2010) ("'[T]o allege an agreement between antitrust co-conspirators [under the Sherman Act], the complaint must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies'") (quoting *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008)).

The Supreme Court has recognized that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses," thereby avoiding needless trials. *Celotex*, 477 U.S. at 323-24. Accordingly, when "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which []he has the burden of proof," the district

court must grant summary judgment. *Id.* at 323. "This is especially true in the area of anti-trust litigation where the complex nature of the subject matter mandates that, absent a valid claim, defendants be protected against the heavy burden of expense and effort entailed in a protracted and intricate trial." *Farnell v. Albuquerque Pub. Co.*, 589 F.2d 497, 502 (10th Cir. 1978); *see also In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012) (observing that, "by avoiding wasteful trials and preventing lengthy litigation that may have a chilling effect on pro-competitive market forces, summary judgment serves a vital function in the area of antitrust law") (internal quotation marks and brackets omitted).

Because Plaintiff fails to proffer admissible evidence to support the essential elements of his antitrust and consumer protection claims, Springfield Hospital's motion for summary judgment with respect to Counts III and IV is GRANTED. *See In re Publ'n Paper Antitrust Litig.*, 690 F.3d at 69 (affirming grant of summary judgment where the plaintiffs "failed . . . to offer any concrete evidence in support of their theory" that a parent company agreed with a competitor to fix prices).

## CONCLUSION

For the reasons stated above, the court DENIES Plaintiff's motion for partial summary judgment (Doc. 36) and GRANTS IN PART AND DENIES IN PART Springfield Hospital's cross-motion for partial summary judgment. (Doc. 38.)
SO ORDERED.

Dated at Rutland, in the District of Vermont, this 24th day of June, 2014.

*/s/ Christina Reiss*

_____
Christina Reiss, Chief Judge
United States District Court